UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LUPE STRATTON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 19-cv-11499-DJC |
| v. | ) ) | |
| BENTLEY UNIVERSITY, | ) ) | |
| Defendant. | ) ) ) | |

MEMORANDUM AND ORDER

CASPER, J.                                                     December 23, 2021

## I.    Introduction

Plaintiff Lupe Stratton ("Stratton") has filed this lawsuit against her former employer, Bentley University ("Bentley") alleging discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq*., and Mass. Gen. L. c. 151B ("Chapter 151B") (Count I), violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2614 *et seq.* (Counts II and III), disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (Count IV and V) and Chapter 151B (Count VI) and retaliation in violation of Chapter 151B (Count VII).  D. 27-1.  Bentley has moved for summary judgment.  D. 57.  For the reasons stated below, the Court ALLOWS the motion.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are undisputed unless otherwise noted and are drawn from Bentley's statement of material facts ("SOF"), D. 59, and Stratton's response to same, D. 68.[1]

### A.        Stratton's Employment at Bentley

On or about August 1, 2016, Stratton began working as Executive Program Coordinator at Bentley's User Experience Center ("UXC"), a professional consulting service related to user experience, where she would provide marketing, program and business development support to the UXC and its academic and professional development component, UXC Certificate.  D. 59 ¶¶

---

[1] Stratton purports to dispute much of Bentley's SOF by citing her supplemental SOF submitted with her opposition, see, e.g., D. 68 ¶¶ 13, 16-17, 19-25, 27-28, 31-35 (citing D. 69), however, "submission of a separate statement of undisputed facts [by the opposing party] is not contemplated by [Local Rule 56.1]," and the Court will not consider these statements to the extent they fail to comply with the rule, are "immaterial, or constitute conclusions of law."  See Plourde v. Sorin Grp. USA, Inc., 517 F. Supp. 3d 76, 81 (D. Mass. 2021) (quoting Terry v. SimplexGrinnell LP, No. 11-cv-40117-TSH, 2013 WL 1332240, at *1 (D. Mass. Mar. 28, 2013)) (citing Local Rule 56.1).  Moreover, those facts not controverted by Stratton's response to Bentley's SOF are deemed admitted for the purpose of resolving the motion for summary judgment.  See id.

1, 4-6; D. 68 ¶ 1, 4-6.  Stratton's direct supervisors, William Gribbons ("Gribbons"), Director of

the Human Factors and Information Design, and William Albert ("Albert"), the UXC Executive

Director, interviewed and selected Stratton for the position.  D. 59 ¶¶ 2, 8; D. 68 ¶¶ 2, 8.  Gribbons

oversaw all operations at UXC.  D. 59 ¶ 8; D. 68 ¶ 8.  Gail Wessel ("Wessel"), a white woman,

and Janell Pace ("Pace"), a Black woman, preceded Stratton in the role.  D. 59 ¶¶ 11-12; D. 68 ¶¶

11-12.  Both Wessel and Pace complained about the position's workload and believed that the

position was more than a one-person job.  D. 59 ¶ 14; D. 68 ¶ 14.  Stratton's job description detailed

that she would be responsible for a variety of administrative and program manager tasks, like

processing invoices, maintaining files for contracts, invoices and credit card statements, preparing

correspondence to external constituents, responding to inquiries regarding UXC programs,

greeting study participants to the UXC, making arrangements for clients visiting the UXC, and

organizing internal and external meetings, including conferences and information sessions.  D. 59

¶ 7; D. 68 ¶ 7.

      **B.**      **Stratton's Job Performance**

The parties dispute the extent to which Stratton was able to complete her assigned work in

an acceptable and timely manner and her responsiveness and attitude at work.  D. 59 ¶¶ 13, 27-28,

33-37; D. 68 ¶¶ 13, 27-28, 33-37.  Gribbons and Albert communicated their frustration to Stratton

with the amount of time she was spending on marketing for UXC Certificate and the level of output

they observed.  See id.; D. 59-1 at 60.  In a June 2018 performance review, Gribbons and Albert

described areas that Stratton "largely handled well," or where her performance was "very strong,"

"strong," and "effective," while also highlighting areas for improvement, particularly related to

Stratton's responsibility to drive enrollments for UXC Certificate courses.  See D. 59-1 at 80-87.

Gribbons and Albert allowed Stratton to devote certain workdays to UXC and certain workdays to UXC Certificate, and to transfer certain administrative tasks to other UXC employees. D. 59 ¶¶ 23-24; D. 68 ¶¶ 23-24.  Stratton also had the assistance of an undergraduate and graduate student worker.  D. 59 ¶ 25; D. 68 ¶ 25.

### C.      Complaints to Human Resources

Stratton complained to David Hatch ("Hatch") in Human Resources regarding her work environment, including Gribbons' and Albert's management style.  D. 59 ¶ 42; D. 68 ¶ 42.  The parties dispute the extent to which Stratton also made complaints about discrimination or a hostile work environment, and whether Stratton provided specific examples, although it is undisputed that Stratton did not lodge a formal written complaint detailing same even after Hatch provided her with Bentley's procedures for doing so.  D. 59 ¶¶ 43-45; D. 68 ¶¶ 43-45.

Stratton testified about several instances that she reported to Hatch where she felt that her work environment was hostile because of her race, national origin or gender.  For example, she testified that when cleaning Pace's former desk, either Gribbons or Albert made a comment that questioned whether Brockton, where Pace's children attended school, had an "actual" school district.  See D. 69 ¶ 14.  Stratton also testified that Gribbons described other female employees' job performance negatively, including reference to one as a "dinosaur," and that Albert described the administrative duties to be completed by a male student worker as traditionally female responsibilities.  Id. ¶¶ 11-12.

### D.      Requests for Leave and Accommodations

Stratton experienced chronic pelvic pain beginning in 2017 that lasted during her tenure at UXC, which caused her to request certain accommodations from Bentley.  Stratton submitted a doctor's letter to Hatch in November 2017 stating that she should not sit for long periods of time

and that she would benefit from working at home two days a week for an undisclosed medical condition.  D. 59 ¶ 47; D. 68 ¶ 47.   In response, Hatch requested additional information related to the underlying medical condition and provided Stratton with Bentley's policies for requesting an accommodation under the ADA, which states that "if the disability or need for the accommodation is not obvious, Bentley will ask employees to provide supporting documents from the employee's physician outlining the disability and indicating that the disability necessitates a reasonable accommodation."  D. 59 ¶¶ 48-49; D. 68 ¶¶ 48-49.  In January 2018, Stratton submitted a second doctor's letter stating that she needed to attend physical therapy and work from home twice a week due to chronic pain worsened by prolonged sitting.  D. 59 ¶ 51; D. 68 ¶ 51; D. 59-1 at 102.  On January 22, 2018, Plaintiff requested intermittent leave to attend medical appointments twice a week under the FMLA, which Bentley approved.  D. 59 ¶¶ 53-54; D. 68 ¶¶ 53-54.  On February 5, 2018, Bentley denied Stratton's request for accommodation to work from home twice a week, stating that allowing such accommodation was an "undue hardship" on UXC and noting that her request for the accommodation did not specify her medical condition, but offered the alternative accommodation that Stratton could work from a different location on campus that she could arrange with Gribbons and Albert.  D. 59 ¶¶ 56-57; D. 68 ¶¶ 56-57; D. 59-1 at 98.  Stratton testified that her request to work from home was to allow her to sit in an alternate position (i.e., not a 90-degree angle), to relieve her pelvic pain.  D. 59 ¶ 59; D. 68 ¶ 59.  Gribbons and Albert proposed to Stratton an alternate location on campus to work, where she would not have to sit upright, which she accepted.  D. 59 ¶ 60; D. 68 ¶ 60.

### E.    Resignation from UXC

In May 2018, Gribbons and Albert placed Stratton on a performance improvement plan ("PIP").  D. 59 ¶ 69; D. 68 ¶ 69.  Because she was on a PIP, as per Bentley policy, Stratton was

unable to apply for other positions internally at Bentley.  D. 59-1 at 51.  The parties dispute whether

the PIP altered certain of Stratton's job responsibilities at UXC, namely her performance goals and

administrative tasks.  D. 59 ¶ 71; D. 68 ¶ 71.  Stratton testified that the PIP set out unreasonable

performance goals that were unattainable because she had been given these additional

administrative tasks.  D. 69 ¶¶ 68-70.  In a June 2018 performance review, Gribbons and Albert

wrote that Stratton continued to struggle with certain goals outlined in the PIP, specifically her

resistance to accepting their feedback.  D. 59 ¶¶ 72-73; D. 68 ¶¶ 72-73; D. 59-1 at 80-87.

Stratton resigned from UXC on July 9, 2018 and offered to stay on in her position past her

scheduled end date while Gribbons and Albert searched for her replacement.  D. 59 ¶¶ 75, 77; D.

68 ¶¶ 75, 77.

## IV.     Procedural History

Stratton initiated this action on July 9, 2019, D. 1, and amended her complaint on May 27,

2020.  D. 27-1.  Bentley has now moved for summary judgment.  D. 57.  The Court heard the

parties on the pending motion and took the matter under advisement.  D. 78.

## V.     Discussion

### A.     Discrimination and Retaliation (Count I)

#### 1.     Discrimination

Stratton claims that Bentley discriminated against her because of her race, gender and

national origin.  D. 67 at 17.  Because Stratton "has not provided direct proof of discriminatory

animus, the burden-shifting sequence set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802-805 (1973), applies."  Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019); Walker

v. City of Holyoke, 523 F. Supp. 2d 86, 101 (D. Mass. 2007) (applying same framework to

Massachusetts discrimination law).  To prevail, Stratton must first "establish a prima facie case by

showing that (1) she is 'a member of a protected class'; (2) she is 'qualified' for the job she seeks; (3) she has 'suffer[ed] an adverse employment action at the hands of her employer'; and (4) there is 'some evidence of a causal connection between her membership in a protected class and the adverse employment action.'" Luceus, 923 F.3d at 258 (quoting Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011)) (alteration in original). "Once she has established a prima facie case, the burden of production shifts to [Bentley], who 'must establish a legitimate, nondiscriminatory justification for the adverse employment action.'" Id. (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015)). If Bentley makes such a showing, "they are entitled to summary judgment unless [Stratton] 'raise[s] a genuine issue of material fact that the reasons offered by [Bentley] were'" pretextual. Id. (citation omitted).

As to Stratton's prima facie case, Bentley argues that she cannot show a materially adverse action because she voluntarily resigned her position at UXC. D. 58 at 4-6. Here, "[a]n 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace,' and typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61–62 (2006); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). "A materially adverse change in the terms and conditions of employment 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)).

Stratton counters that she has shown a constructive discharge, a materially adverse action. D. 67 at 17. To succeed on a constructive discharge claim, Stratton "must offer evidence of more severe harassment than that required for a hostile work environment claim." Luciano v. Coca-

Cola Enterprises, Inc., 307 F. Supp. 2d 308, 320 (D. Mass. 2004) (citing Hernandez–Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998)).  Thus, Stratton must show "that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign."  Marrero, 304 F.3d at 28 (citation and internal quotation marks omitted); see Luciano, 307 F. Supp. 2d at 320 (noting "Massachusetts and federal law are in accord in defining a constructive discharge").  "The standard to meet is an objective one [and] cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held."  Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 25 (1st Cir. 2013) (citation and internal quotation marks omitted).  Instead, "the working conditions [must be] so unpleasant that staying on the job while seeking redress [would have been] intolerable."  Marrero, 304 F.3d at 28 (citation and internal quotation marks omitted).

Here, Stratton has not made such a showing.  Stratton only points to a handful of specific comments by Gribbons and Albert:  questioning the Brockton school district, referring to another employee as a "dinosaur," and describing certain administrative tasks as traditionally female.  See D. 69 ¶¶ 11-12, 14.  Additionally, Stratton testified that Gribbons and Albert described her job as "different," and stated that she was "not similar to the staff at the UXC."  D. 69 ¶ 48; D. 70-1 at 36.  Stratton, however, does not explain how any of these comments created an objectively intolerable workplace, rather than her own subjective interpretation of the comments, such that she was unable to perform her job and had no other choice but to resign due to same.  See Luciano, 307 F. Supp. 2d at 321 (rejecting claim of constructive discharge where plaintiff failed to show incidents "created such an inability to perform her job that resignation was her only plausible choice"); Ara v. Tedeschi Food Shops, Inc., 794 F. Supp. 2d 259, 264 (D. Mass. 2011) (concluding that plaintiff had not shown constructive discharge where they pointed to unspecified instances of

Case 1:19-cv-11499-DJC   Document 79   Filed 12/23/21   Page 9 of 17

supervisor being disrespectful or using derogatory language toward them); cf. Fisher v. Town of

Orange, 964 F. Supp. 2d 103, 117 (D. Mass. 2013) (denying summary judgment where female

firefighter "was told she would not fit in, urged not to take the position, exposed to pornography,

subjected to rumors about walking around in her underwear, criticized for watching soap operas

and reading romance novels, informed that 'pink has no place in a fire house,' and told that she

didn't deserve her job" and also showed that fire chief "was made aware of at least some of this

conduct, and did not put a stop to it").  Instead, Stratton asserts that she performed her job well

throughout her time at UXC, see D. 69 ¶ 10, and even upon resignation offered to stay on until her

replacement was hired, see D. 59 ¶¶ 75, 77; D. 68 ¶¶ 75, 77.  Accordingly, on this record, Stratton

cannot show constructive discharge.

> 2.  *Retaliation*

Stratton asserts that Bentley retaliated against her for making complaints to Hatch of

gender, race and national origin discrimination.  D. 67 at 4-6.  "To succeed on a retaliation claim,

[Stratton] must show that her employer took some objectively and materially adverse action

against her because she opposed a practice forbidden by Title VII, such as race discrimination."

Bhatti, 659 F.3d at 73 (citing Burlington Northern & Santa Fe Ry. Co., 548 U.S. at 59); Mole v.

Univ. of Massachusetts, 442 Mass. 582, 592 (2004) (applying same framework for Massachusetts

retaliation claim).  Bentley again challenges Stratton's showing of a materially adverse action.  See

D. 58 at 4-6.  Stratton counters that the record contains evidence of several adverse actions.  See

D. 67 at 4.  Aside from constructive discharge, which the Court rejected above, Stratton asserts

that she faced a retaliatory hostile work environment, a lowered performance evaluation,

reprimands, and placement on a PIP, and refusal to accommodate her disabilities, though she offers

no explanation as to her showing of each.  Id. at 4-6.

Subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an actionable adverse employment action if the plaintiff shows "that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." Noviello v. City of Boston, 398 F.3d 76, 89–92 (1st Cir. 2005).  Although Stratton's retaliation claim fails for the reason described below, the Court notes that Stratton does not cite to any specific conduct in the record to support her argument that she was subjected to an "escalated hostile work environment," see D. 67 at 6, particularly conduct following the alleged complaints, and has not identified any harassment that would rise to that level, either in its severity or its interference with her job performance.  Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003) (affirming summary judgment where "complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [plaintiff's] work performance").

As to Stratton's performance reviews, the alleged reprimands she received, and the PIP, such conduct does not constitute a materially adverse action in the absence of evidence that such events carried tangible, negative consequences.  Bhatti, 659 F.3d at 73 (explaining that reprimands that do not carry "tangible consequences" are not adverse actions); Simon v. Harvard Vanguard Med. Assocs., Inc., No. 14-cv-12558-RGS, 2015 WL 7201170, at *7 (D. Mass. Nov. 16, 2015) (noting that "[p]lacing an employee on an improvement plan without any changes in [their] conditions of employment . . . fails the adverse action test") (citations omitted).  Here, there is no evidence in the record of any tangible negative consequences from the performance review, reprimands, or the PIP, like being docked pay, benefits, or decreased job responsibilities.  See D. 69 ¶¶ 56-57, 66-67 (asserting reprimands but no consequences from same).  Stratton also asserts

10

that Gribbons and Albert asked her to take on additional responsibilities or work longer hours.  An

increased workload in the same job, however, also does not constitute an adverse employment

action.  See Marrero, 304 F.3d at 24; Bhatti, 659 F.3d at 74 (concluding that plaintiff's assertion

"that she work longer hours" and management's selective enforcement of workplace rules against

her in the form of critical memoranda" were not adverse employment actions).

Even without the infirmities described above, the retaliation claim fails because Stratton

cannot establish a but-for causal connection between the complaints and any of the purported

adverse employment actions.  See Martinelli v. Bancroft Chophouse, LLC, 357 F. Supp. 3d 95,

103 (D. Mass. 2019) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)).

The undisputed record shows that neither Gribbons nor Albert was ever aware that Stratton made

any complaints of discrimination to Hatch.  See D. 59 ¶ 19; D. 68 ¶ 19.  In other words, Gribbons

and Albert could not have, as a matter of law, retaliated against Stratton for her complaints to

Hatch because they never knew she made the complaints.[2]  See Martinelli, 357 F. Supp. 3d at 104

(concluding lack of causation where plaintiff did not show evidence that management subject to

retaliation claim was aware of harassment complaint); Noviello, 398 F.3d at 93 (explaining that

"only those actions, directed at a complainant, that stem from a retaliatory animus . . . may be

factored into the hostile work environment calculus").

Accordingly, the Court allows Bentley's motion for summary judgment as to Count I.

---

[2] Stratton asserts, without citing to any record evidence or authority, that knowledge of the complaints could be inferred from Hatch's frequent communication with Gribbons and Albert, see D. 67 at 8, but the Court cannot draw such an inference when Stratton has not disputed that Gribbons and Albert never learned about the complaints, see D. 59 ¶ 19; D. 68 ¶ 19.

### B.      Violation of FMLA (Counts II and III)

"The FMLA provides certain qualified employees with a number of substantive rights and prohibits employers from discriminating against employees who have availed themselves of FMLA benefits." Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d 158, 164 (D. Mass. 2004). Accordingly, "the FMLA and its accompanying regulations make it unlawful for any employer to, among other things: (1) 'interfere with, restrain, or deny the exercise' of any FMLA right . . . or (2) retaliate or 'discriminat[e] against employees . . . who have used FMLA leave[.]" Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014) (citation omitted). Here, Stratton claims that Bentley interfered with her rights under the FMLA to take leave, and that Bentley retaliated against her for same. D. 67 at 8-11.

#### 1.      FMLA Interference

Bentley asserts that Stratton's interference claim fails because her request to take FMLA leave was approved, once she submitted required documentation, which she then used throughout her employment. D. 58 at 13. Stratton asserts that an interference claim can include discouraging an employee from taking leave. D. 67 at 10. The "issue [on an interference claim] is simply whether the employer provided its employee the benefits to which she was entitled per the FMLA." Carrero-Ojeda, 755 F.3d at 722. As there is no dispute that Bentley approved Stratton's FMLA leave request, and that Stratton used the leave to attend her medical appointments without issue, Stratton's claim fails. See D. 59 ¶¶ 53-55; D. 68 ¶¶ 53-55; Kleya v. Karl Storz Endovision, Inc., 385 F. Supp. 3d 99, 104 (D. Mass. 2019) (dismissing FMLA interference claim where plaintiff "received all her requested leave" and was thus "provided . . . the benefits to which she was entitled per the FMLA").

#### 2.      FMLA Retaliation

To state a claim for FMLA retaliation, Stratton must show that "(1) she availed herself of a protected FMLA right; (2) she was 'adversely affected by an employment decision;' and (3) 'there was a causal connection between [her] protected conduct and the adverse employment action.'" Germanowski v. Harris, 854 F.3d 68, 73 (1st Cir. 2017). Where, as here, direct evidence of retaliation does not exist, courts apply the same McDonnell Douglas framework described above. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335-36 (1st Cir. 2005).

Bentley argues that Stratton did not suffer an adverse employment action because of her FMLA leave. D. 58 at 13-14. In response, Stratton points out that Gribbons and Albert placed her on a PIP three months after her FMLA leave was approved. D. 67 at 8-10.[3] As explained above, Stratton's placement on a PIP does not constitute an adverse action because it lacked tangible and negative employment consequences. See Simon, 2015 WL 7201170, at *7. To the extent Stratton relies upon the timing of same, "[c]hronological proximity does not by itself establish causality, particularly" where, as here, "[t]he larger picture undercuts any claim of causation." Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 85 (1st Cir. 2005) (citation and internal quotation marks omitted); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (affirming summary judgment in Title VII retaliation case for failure to establish causation because "[w]ithout some corroborating evidence suggestive of causation—and there is none here—a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action").

---

[3] Stratton requested FMLA leave in January 2018, which Bentley approved in February 2018, and was placed on a PIP in May 2018. D. 59 ¶¶ 53-54, 69; D. 68 ¶¶ 53-54, 69.

Accordingly, the court allows Bentley's motion for summary judgment as to the FMLA claims.

## C.      Disability Discrimination

Stratton asserts a hostile work environment claim because of disability under the ADA (Counts IV and V), one count of disability discrimination in violation of Chapter 151B (Count VI) and one count of retaliation in violation of Chapter 151B (Count VII).[4]

### 1.      Hostile Work Environment (Counts IV and V)

A hostile work environment claim in violation of the ADA requires Stratton to show, *inter alia*, that the allegedly discriminatory conduct was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment."  Murray v. Warren Pumps, LLC, 821 F.3d 77, 86 (1st Cir. 2016)).  Here, Stratton cannot show pervasive conduct because she has not identified any comments or conduct related to her asserted disability[5] following disclosure of same to Bentley. See D. 67 at 17; D. 69 ¶¶ 67, 78-79; cf. Arrieta-Colon v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 89 (1st Cir. 2006) (affirming finding of hostile environment where evidence showed plaintiff was subject to "constant mockery and harassment . . . by fellow co-workers and supervisors alike due to his condition" that was "constant and

---

[4] "To establish a prima facie claim of retaliation in violation of Chapter 151B, [Stratton] must demonstrate that, "1) she engaged in protected conduct; 2) she suffered an adverse employment action; and 3) the two were causally related." Gudava v. Ne. Hosp. Corp., 440 F. Supp. 3d 49, 59 (D. Mass. 2020) (citing Noviello, 398 F.3d at 88).  Bentley again argues that Stratton was not subjected to an adverse employment action because of her accommodation request, D. 58 at 20, and Stratton does not address Count VII in her opposition, see D. 67.  For the same reasons articulated above, Stratton has not shown that she suffered an adverse action (i.e., constructive discharge, hostile work environment, reprimands and PIP).  Accordingly, the Court allows summary judgment as to Count VII.

[5] To the extent that Bentley disputes that Stratton was disabled, D. 58 at 17-18, the Court need not reach that issue given the other analysis here and instead assumed *arguendo* that she was disabled for the purposes of this analysis.

unbearable, leading to [his] resignation"). To the extent Stratton testified that she felt demeaned and humiliated at work (i.e., the comments that she cites for her race and gender discrimination claims), none of those instances she cites relates to or mentions her purported disability. See D. 69 ¶¶ 56-57, 66-67, 86. Moreover, Stratton has not shown any facts to suggest the alleged harassment was pervasive, such that it "amount[ed] to discriminatory changes in the terms and conditions of employment." King v. Mestek, Inc., 270 F. Supp. 3d 457, 464 (D. Mass. 2017) (allowing summary judgment for employer on ADA hostile work environment claim where plaintiff pointed to isolated comments related to plaintiff's medical leave). As discussed above, Stratton asserts that she performed her job well throughout her time at UXC, see D. 69 ¶ 10, and even upon resignation offered to stay on until her replacement was hired, see D. 59 ¶¶ 75, 77; D. 68 ¶¶ 75, 77; cf. Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (concluding that jury reasonably found for plaintiff in hostile work environment claim where there was evidence that plaintiff "was subject to such constant ridicule about his mental impairment that it required him to be hospitalized and eventually to withdraw from the workforce").

### 2. Disability Discrimination – Failure to Accommodate (Count VI)

"A 'qualified handicapped person' is entitled to a 'reasonable accommodation' that will enable [her] to perform the essential functions of his job, so long as the accommodation does not place an undue burden or hardship on the employer." Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010) (citing Mass. Gen. L. c. 151B, § 4(16)). To prevail on a failure to accommodate claim under Chapter 151B, Stratton must show that she, "(1) had a qualified handicap, (2) was capable of performing the essential functions of her job with reasonable accommodation, and (3) requested such an accommodation; and that (4) the employer rejected the request and (5) the

15

rejection resulted in some harm." Workman v. Outfront Media, LLC, 474 F. Supp. 3d 373, 376 (D. Mass. 2020) (citing Alba v. Raytheon Co., 441 Mass. 836, 843 n.9 (2004)).

Bentley argues that it provided Stratton with a reasonable accommodation, and she used that accommodation effectively, therefore her prima facie case fails as to the fourth and fifth elements. D. 58 at 16. Stratton counters that Bentley denied her initial request to work from home, and, once she was provided with an alternate accommodation to work elsewhere on campus, was not permitted to use it. D. 67 at 16. Here, Bentley initially rejected Stratton's request to work from home two days a week, but thereafter consulted with Stratton to identify other acceptable locations where she could sit in alternate positions that would relieve her pelvic pain. D. 59 ¶¶ 56-57, 59; D. 68 ¶¶ 56-57, 59; D. 59-1 at 98. Stratton accepted and utilized the alternative accommodation where she was able to sit accordingly. D. 59 ¶ 60; D. 68 ¶ 60;[6] see D. 69 ¶ 65 (conceding that alternative accommodation "did not inhibit the Plaintiffs ability to complete all job-related tasks"). Bentley "need not provide the best accommodation available, or the accommodation specifically requested by [Stratton]. Rather, [Bentley] must provide an accommodation . . . that is effective for its purpose." Finlan v. Verizon New England, Inc., 74 Mass. App. Ct. 1127, 2009 WL 2252267, at *2 (2009) (quoting MCAD Guidelines: Employment Discrimination on the Basis of Handicap, Chapter 151B, § II.C (1998)); see Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 170 (D. Mass. 2004) (noting that ADA "provides the

---

[6] To dispute this fact, Stratton asserts that the alternative accommodation provided her only partial relief, despite enabling her to "complete all job-related tasks." See D. 68 ¶ 60. She cites to her own supplemental SOF, D. 69 ¶ 65, which in turn relies upon an unspecified assertion in her answers to Bentley's interrogatories, stating that the "alternative accommodation did not address all of [her] medical concerns," D. 70-3 at 5, and her unverified amended complaint. The Court rejects Stratton's reliance upon conclusory assertions, see Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997) (striking conclusory statements in SOF not supported by specific citations to record evidence), and citation to her unverified complaint, see Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991).

employer with the ultimate discretion to choose between effective accommodations") (citation omitted).  As noted above, Stratton argues that she was reprimanded for not being present in the office, although her accommodation permitted her to work elsewhere on campus.  See D. 67 at 16; D. 69 ¶¶ 78-81.  Stratton admits, however, that she was allowed to work elsewhere, although she stresses that Gribbons and Albert requested her whereabouts when she was working at these alternate locations, despite her understanding that she was not required to provide same.  See D. 70-1 at 37:144:2-10, 44:171:7-14.  Even assuming Stratton was not required to provide her whereabouts as part of the original accommodation, Stratton has not presented any evidence that she was unable to work in these alternate locations; to the contrary, she admits that she was able to, and that such alternate locations allowed her to work effectively because she could sit in different positions.  See id.; D. 59 ¶ 60; D. 68 ¶ 60.

Accordingly, the Court allows Bentley's motion for summary judgment on Count VI.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Bentley's motion for summary judgment, D. 57.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge