# United States Court of Appeals
## For the First Circuit

No. 22-1061

LUPE STRATTON,

Plaintiff, Appellant,

v.

BENTLEY UNIVERSITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Lipez, Circuit Judges.

Helen G. Litsas, with whom Law Office of Helen G. Litsas was
on brief, for appellant.

Gregory A. Manousos, with whom Jacob J. Thaler and Morgan,
Brown & Joy, LLP were on brief, for appellee.

Steven John Winkelman, Attorney, with whom Gwendolyn Young
Reams, Acting General Counsel, Jennifer S. Goldstein, Associate
General Counsel, Anne Noel Occhialino, Acting Assistant General
Counsel, and Nicolas Sansone, Attorney, were on brief, for the
Equal Employment Opportunity Commission, amicus curiae.

August 15, 2024

LIPEZ, **Circuit Judge**.  Lupe Stratton worked at Bentley University from August 2016 to July 2018.  She alleges that, during her tenure, her supervisors discriminated against her because of her gender, race, disability, and Guatemalan origin.  After she complained about that discrimination to Bentley's human resources department, her supervisors placed her on a performance improvement plan, which she claims was in retaliation for those complaints.  Stratton also contends that Bentley interfered with her right to medical leave and failed to provide her with reasonable accommodations for her disability.  After two years on the job, she felt her workplace was so intolerable that she had no choice but to resign.

Stratton sued Bentley for employment discrimination under a variety of federal and Massachusetts anti-discrimination statutes.  The district court entered summary judgment in Bentley's favor on each of Stratton's claims.  Though the court evaluated Stratton's Title VII retaliation claim under an incorrect legal standard, we nonetheless agree that each of Stratton's claims fails to survive as a matter of law.  We thus affirm, taking the opportunity to clarify the relevant law governing Title VII retaliation claims in our circuit.

## I.

We recount the facts in the light most favorable to Stratton, who was the non-moving party at summary judgment.  See

Ing v. Tufts Univ., 81 F.4th 77, 79 (1st Cir. 2023).

## A.    Stratton's Employment at Bentley

        Bentley University is a private academic institution in
Waltham, Massachusetts.  The school features a User Experience
Center ("UXC" or "Center") that offers both academic coursework
and professional consulting services involving the interaction
between human psychology and technology platforms.  As part of
Bentley's "Human Factors" graduate program, the Center's
educational component provides not-for-credit professional
development courses, such as the "UXC Certificate Program" and the
"UXC Boot Camp."  Unlike traditional graduate-level classes, the
Center's educational programs have open enrollment and take place
on a compressed timeline, with some programs spanning only two
days.  As a complement to its academic mission, the Center's
employees, students, and alumni also provide related for-profit
professional consulting services ("UXC Services") to third-party
clients.

        In August 2016, Stratton began working as the Executive
Program Coordinator at the Center.  In that role, she provided
marketing, program management, and business development support
for both the UXC Certificate Program and UXC Services.  For the
UXC Certificate Program, Stratton would recruit students,
facilitate their courses, deal with the logistics of setting up
classrooms, develop marketing plans for the program, and keep track

of the revenue necessary to meet the Center's goals.  For UXC Services, Stratton developed sales leads, controlled the Center's social media presence, and managed marketing endeavors.

Stratton reported directly to William Gribbons and William Albert, both of whom interviewed and hired her.  At the time, Gribbons was the Director of Bentley's "Human Factors" graduate department, overseeing the broader graduate program as well as the Center.  Albert, as Executive Director of the Center, was fully responsible for UXC Services and reported to Gribbons.  Gribbons supervised Stratton's work related to the educational components of the Center while Albert supervised Stratton's work for UXC Services.

It is undisputed that Stratton "complained about the position's workload and believed the position was more than a one-person job."  Before offering her the job, Stratton's supervisors told her the position was stressful.  The position was previously held by Gail Wessell, a white woman, and Janell Pace, a Black woman.  Both Wessell and Pace warned Stratton about the demanding nature of the job, explaining to her that they had not experienced it to be a one-person position.  Wessell also noted that she had complained to Bentley's human resources department about the intense workload.[1]  Stratton asserts that at times she received

---

[1] The record does not suggest when Wessell lodged these complaints.

conflicting instructions from her two supervisors, such as when they would identify different time-sensitive priorities for her attention.

Bentley, by contrast, provides evidence that Stratton lacked the productivity of her predecessors in that same role, despite Stratton having more student workers to assist with her tasks. Just months into her tenure at Bentley, Stratton's supervisors exchanged emails with each other about Stratton's less-than-satisfactory performance. For example, in a December 2016 email to Albert, Gribbons said he had been worried about Stratton's efficiency for months because she often worked late into the evening. A few months later, in March 2017, Gribbons sent an email to Albert complaining that Stratton had spent nearly double the marketing budget from the prior year only to have lackluster enrollment in the Center's academic programs.

It is undisputed that Stratton received some positive feedback during her time at Bentley, including statements by Gribbons that Stratton's work was excellent. Still, Stratton's supervisors provided increasingly negative feedback to her. In October 2017, for instance, Albert informed Stratton that she needed to be more responsive to email communications after she had ignored some important inquiries. In the same message, Albert asked Stratton to be more receptive to constructive criticism after

some incidents in which Albert felt she had deflected blame onto others.

Gribbons's treatment was harsher.  Stratton testified that Gribbons would express his frustrations in ways that she felt were hostile and unprofessional.  For example, Gribbons told Stratton, in what she described as an aggressive and intimidating tone, that she should "stop failing" because ever since she took over the UXC Certificate Program he had "never seen such low [attendance] numbers."  These disparaging remarks, according to Stratton, were not isolated events.  She testified that Gribbons was "constant[ly] berating [her for her] low numbers."  When the UXC Boot Camp had to be cancelled in March 2018 due to low enrollment, Stratton testified that Gribbons demanded that Stratton take full responsibility for the program's failure to launch.  When she declined to accept such blame, Stratton recalled that Gribbons slammed his hand on his desk and told her that she could not leave his office without agreeing to continue the discussion another time.

## B.  Complaints to Human Resources

At some point on or before April 19, 2018, Stratton reached out to David Hatch, the Senior Human Resources Partner at Bentley, to discuss complaints she had about the workplace.[2]  The

---

[2] The record does not reveal a specific date on which Stratton began to make complaints of discrimination.  But viewing the

parties dispute the frequency and content of these complaints.
Stratton testified that, over time, she had numerous discussions
with Hatch about Gribbons's management style, the workload
expected of the position, and what Stratton considered to be a
discriminatory work environment.  She told Hatch of several
instances where she felt that Gribbons and Albert made
discriminatory comments based on race and gender.  As one such
example, Stratton told Hatch about a comment Gribbons made to
Stratton while the two of them were cleaning Pace's desk.
Gribbons, according to Stratton, questioned whether Brockton,
where Pace's children (Pace is a Black woman) attended school, had
an "actual" school district.[3]

Stratton also told Hatch that Gribbons had described
other female employees' job performance negatively, such as when
she heard him refer to an employee in another department as a
"dinosaur."  In another instance, Stratton reported that Albert

_____

record in a light most favorable to her, we can infer she raised
these complaints on or before April 19, 2018.  On that day, Hatch
emailed Stratton a copy of Bentley's "Workplace Discrimination,
Harassment and Bullying Policy."  In that same email, Hatch also
explained how Stratton could report concerns about harassment or
bullying.

[3] Stratton later testified that she considered this remark to
be inappropriate.  In her view, Gribbons "felt entitled to make
such a comment in front of another person of color as if that
was -- it was disparaging and demeaning."

described the administrative duties assigned to a male student worker as stereotypically "female responsibilities."  Moreover, Stratton noted that Gribbons and Albert described her job as "different," in that she was "not similar to the staff at the UXC."

Beyond these specific examples, Stratton expressed to Hatch more generally that Gribbons and Albert spoke to her in a demeaning manner, reprimanded her for minor issues, and treated her differently than other employees.  Stratton never lodged a written complaint involving these or other allegations of discrimination.

During her deposition, Stratton recalled other instances of alleged hostility.  For example, Stratton testified that Gribbons had engaged in "public humiliation" by reprimanding her for using her computer during a staff meeting, even though other co-workers were also using their computers during the meeting.

## C.   Requests for Leave and Accommodation

Stratton began experiencing chronic pelvic pain around August 2017.  In November 2017, she submitted a doctor's letter to Bentley explaining that "[d]ue to a medical condition, Ms. Stratton should not sit for long periods of time and would benefit from working at home one or two days a week if needed."  The letter did not identify a specific medical condition underlying the request to work from home.  In response, Hatch asked for additional information about Stratton's medical condition and provided

Stratton with Bentley's policies for formally requesting an accommodation or leave under federal and state law. Bentley's policy states that "if the disability or need for the accommodation is not obvious, Bentley will ask employees to provide supporting documents from the employee's physician outlining the disability and indicating that the disability necessitates a reasonable accommodation."

On January 18, 2018, Stratton submitted a different doctor's letter stating: "Lupe Stratton should attend physical therapy for 2 days per week beginning January 18th, 2018 to April 18th, 2018. She will need to work [from] home for these 2 days per week. She requires this for her medical condition." This letter also did not reference a specific medical condition. A few days later, on January 22, 2018, Stratton requested leave to attend physical therapy appointments twice a week under the Family and Medical Leave Act ("FMLA").

On February 5, 2018, Hatch informed Stratton in writing that her request to work from home had been denied because Bentley determined that such an accommodation would cause the Center "undue hardship." Hatch explained to Stratton that Gribbons and Albert had determined that her presence in the office was necessary to service the daily needs of the Center and to manage certain events, such as the UXC Bootcamp and the Face of Finance Conference. Hatch further noted that her various requests to work from home did not

specify her medical condition.  Hatch told Stratton that, although her remote work request had been denied, they would permit her to work from different locations on campus so she could sit in a position recommended by her doctor.  These alternative locations included the school library and the conference room adjacent to her office, among other places.  Stratton accepted this accommodation and never expressed concerns with its effectiveness in mitigating her pelvic pain.

Stratton's doctor sent Bentley medical documentation specifying Stratton's condition on February 7, 2018.  These documents explained that Stratton suffered from chronic pelvic pain starting in August 2017 and would benefit from sitting in alternate positions (i.e., not a 90-degree angle) at work.  The following day, Bentley granted Stratton's request for leave to attend medical appointments.  Bentley's decision to deny Stratton's remote work request, on the other hand, was not revisited.

When Stratton initially began working in alternative work locations, it was her understanding that she was not required to notify her supervisors of where she was working on campus. Gribbons and Albert, however, soon became frustrated with their lack of knowledge of where Stratton was stationed.  Shortly after the arrangement was approved, Gribbons and Albert asked Stratton to let them know where she was working on a given day.  That

information, Gribbons and Albert explained, would allow them to have impromptu, in-person conversations with her when she was unresponsive to emails during the workday.

## D.   Stratton's Performance Improvement Plan and Resignation

Still dissatisfied with Stratton's productivity, Gribbons and Albert placed her on a performance improvement plan on May 22, 2018.  The plan, as described by Gribbons and Albert, sought to identify specific work-related goals for Stratton. Because Stratton was on a performance improvement plan, she was in theory unable to apply for other positions internally at the school under a Bentley policy.[4]  The parties dispute whether the performance improvement plan altered certain of Stratton's job responsibilities at UXC, namely her performance goals and administrative tasks.  Stratton testified that, in discussing the plan with her, Hatch said that she "was lucky that the only thing that [Gribbons and Albert] did was to put [her] on a performance plan" when she "could be fired for insubordination."[5]

_____

[4] We say in theory because Stratton in fact applied for a different position at Bentley, though she could not recall whether she submitted that application before or after the imposition of the performance improvement plan.  In any event, there is no evidence the policy was enforced against Stratton, given that Bentley advanced Stratton to the final group of candidates for the new position.  Stratton, however, withdrew her application before completing the hiring process.  Also, Stratton did not know about this policy during her tenure.  Indeed, her deposition testimony established that she believed she was "free to apply for other open positions at the university."

[5] The record does not disclose the nature of this alleged

In Stratton's June 2018 performance review, Gribbons and Albert described areas that she "largely handled well," or where her performance was "very strong" and "effective," such as her ability to manage logistics during events.  At the same time, the review emphasized that Stratton failed to achieve certain goals outlined in her performance improvement plan.  For example, Gribbons and Albert explained that Stratton still struggled with responding to constructive criticism.  The review also indicated that Stratton disregarded numerous recommendations from Gribbons regarding marketing strategies for the UXC Boot Camp.

Stratton resigned on July 9, 2018.  She noted in her exit interview that, during her tenure at Bentley, she felt discriminated against based on her gender, national origin, and religion.  When asked if she had any specific examples, she wrote, "no examples only Elizabeth," which Stratton later explained was a reference to disparaging comments about Catholics made by a co-worker.

### E.   The Litigation

In July 2019, after exhausting her administrative remedies, Stratton filed this action against Bentley alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, and

---

insubordination.

Chapter 151B of the Massachusetts General Laws ("Chapter 151B") (Count I); violations of the FMLA, 29 U.S.C. §§ 2614(a), 2615(a)(1)(Counts II and III); disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (Counts IV and V) and Chapter 151B (Count VI); and retaliation for requesting a reasonable accommodation in violation of Chapter 151B (Count VII).

The district court granted summary judgment for Bentley on all of Stratton's claims.  See Stratton v. Bentley Univ., No. 19-CV-11499-DJC, 2021 WL 6098974, at *8 (D. Mass. Dec. 23, 2021). Stratton then moved the district court to alter or amend its judgment.  The district court denied Stratton's motion.  Stratton now appeals those decisions by the district court.

## II.

We review a district court's grant of summary judgment de novo.  Ferrari v. Vitamin Shoppe Indus., 70 F.4th 64, 69 (1st Cir. 2023).  A party is entitled to summary judgment only when the record reveals no genuine issue as to any material fact and judgment is proper as a matter of law.  Motorists Com. Mut. Ins. v. Hartwell, 53 F.4th 730, 734 (1st Cir. 2022).

### A.   Title VII Claims

Title VII's primary objective is to ensure a workplace where individuals are not discriminated against because of their race, ethnicity, religion, or gender.  See Burlington N. & Santa

Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006) [hereinafter "Burlington Northern"]. The statute's "substantive provision" makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" protected characteristics, or "to limit, segregate, or classify [its] employees . . . in any way which would . . . adversely affect [an individual's] status as an employee, because of such individual's" protected characteristics. 42 U.S.C. § 2000e-2(a). A separate "retaliation provision" makes it unlawful for an employer "to discriminate against any of [its] employees . . . because [an employee] has opposed any practice made . . . unlawful" under the substantive provision. Id. § 2000e-3(a). Put broadly, Title VII's substantive provision protects against discrimination based on who one is (i.e., a member of a protected class) while the retaliation provision protects what one does (i.e., engages in protected conduct). See Burlington Northern, 548 U.S. at 63.

### 1. Discrimination

Without direct proof of discrimination, Stratton must satisfy the familiar burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019). Under that standard, Stratton must "establish a prima facie case by showing that (1) she is 'a member of a protected class'; (2) she

is 'qualified' for the job [from which she claims she was constructively discharged]; (3) she has 'suffer[ed] an adverse employment action at the hands of her employer'; and (4) there is 'some evidence of a causal connection between her membership in a protected class and the adverse employment action.'"   Id. (alteration in original) (quoting Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011)).   Once she has established a prima facie case, the burden of production shifts to Bentley to show a legitimate, nondiscriminatory justification for the adverse employment action.  Id.  If Bentley produces such a justification, it is entitled to summary judgment unless Stratton raises a genuine issue of material fact that "the reasons offered by [Bentley] were a pretext for discrimination."  Id. (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015)).  We assume that Stratton meets the first two elements of a prima facie case, and we do not address the fourth element as we find the third element of her prima facie case -- the "adverse employment action" requirement -- dispositive.

"An 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace[.]'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (alterations in original) (quoting Burlington Northern, 548 U.S.

at 61-62).[6]  However, an employee's resignation constitutes an "adverse employment action" only where the employee's working conditions were so difficult that a reasonable person in her position "would have felt compelled to resign." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977)).  In that situation, the employer has "constructively discharged" the employee. Id. at 27.[7]  The standard for a constructive discharge is "an objective one, 'it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held.'" Gerald v. Univ. of P.R., 707 F.3d 7, 25 (1st Cir. 2013) (quoting Roman v. Potter, 604 F.3d 34, 42 (1st Cir. 2010)).  Instead,

---

[6] The Supreme Court recently explained in Muldrow v. City of St. Louis, 144 S. Ct. 967 (2024), that a plaintiff need not show a "significant" change in working conditions resulting from a reassignment decision to make out a Title VII discrimination claim. Id. at 974.  Rather, a discrimination claim under Title VII only requires that the plaintiff show "some harm respecting an identifiable term or condition of employment." Id.  However, Muldrow is not relevant to Stratton's Title VII discrimination claim given that Stratton resigned from her position.

[7] In her opening brief, Stratton asserts that the district court erred "when it limited its analysis of the Plaintiff's adverse employment action to her constructive discharge claim when in fact the record establishes that the Plaintiff offered other example[s] of adverse actions to support her claim."  But Stratton has not identified which additional adverse actions are supported in the record, and this argument is therefore waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  Accordingly, we review only Stratton's constructive discharge theory.

"working conditions [must be] so unpleasant that 'staying on the job while seeking redress [would have been] intolerable.'" Marrero, 304 F.3d at 28 (second alteration in original) (quoting Keeler v. Putnam Fid. Tr. Co., 238 F.3d 5, 10 (1st Cir. 2001)).

Stratton argues that she was constructively discharged because her work environment was intolerably hostile. Bentley, in response, contends that Stratton's examples of hostility are insufficiently egregious to satisfy the constructive discharge test. The district court agreed with Bentley, reasoning that Stratton was not constructively discharged because she "only point[ed] to a handful of specific comments by Gribbons and Albert" without "explain[ing] how any of th[o]se comments created an objectively intolerable workplace." Stratton, 2021 WL 6098974, at *4. The district court therefore concluded that Stratton did not experience an adverse employment action. See id.

We first address Stratton's assertion that she was constructively discharged based on her bosses' disparagement. For example, Gribbons and Albert described Stratton's job as "different" and stated that she was "not similar to the staff at the UXC." Stratton also felt that Gribbons made discriminatory comments, such as when he questioned whether the Brockton School District "was an actual school district" and when he referred to another employee as a "dinosaur." In the same vein, Albert critiqued Stratton's hiring of a male student worker, explaining

that the role involved traditionally female responsibilities.  In another instance, Gribbons engaged in "public humiliation" by reprimanding only Stratton for using her computer during a staff meeting, even though others were using their computers.

These identified remarks may have been "insensitive, unfair, or unreasonable," Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010), but they do not show that Stratton was compelled to leave an objectively intolerable workplace.  See id. (rejecting constructive discharge theory based on a supervisor's "divisiveness" and "generally disagreeable behavior").  Many of the relevant remarks were not directed toward Stratton but were said to, or about, her colleagues.  The Brockton comment, for instance, referred to the school district where Stratton's predecessor had sent her children, while the "dinosaur" insult described an employee in a different department.  See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 51 (1st Cir. 2008) (noting an employer's use of the term "dinosaur," along with other insults, did not establish a constructive discharge on their own).

Though some of the cited comments and incidents may speak to Gribbons's reasonableness and temperament as a boss, Title VII does not shield employees from these sorts of "ordinary slings and arrows that workers routinely encounter in a hard, cold world." Id. at 50 (quoting De La Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004)); see also Faragher v. City of Boca Raton,

524 U.S. 775, 788 (1998) (noting that Title VII does not protect against "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" (quoting Barbara T. Lindemann & David D. Kadue, Sexual Harassment in Employment Law 175 (1992))).  Nor does the constructive discharge standard "guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000); see also De La Vega, 377 F.3d at 118 (rejecting constructive discharge claim based, among other things, on an employer's reprimand of the plaintiff during a meeting with her co-workers).

Beyond her supervisors' comments, Stratton briefly raises other workplace grievances in attempting to satisfy the constructive discharge test.  Stratton argues, for example, that her placement on a performance improvement plan was unfounded and indicative of discrimination.  She also takes issue with Hatch saying she was "lucky" that Gribbons and Albert put her on a performance plan when she could have been "fired for insubordination."

These examples are similarly unavailing.  It is true that an employee may show a constructive discharge if she is told "that she will be fired." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 97 (1st Cir. 2018) (emphasis added).  But Hatch simply

conveyed that Stratton <u>could</u> be fired.  Though Stratton feared the performance improvement plan "set the stage" for her firing, an "apprehension of future termination is insufficient to establish constructive discharge." <u>Torrech-Hernandez</u>, 519 F.3d at 52.[8]  And even if the performance improvement plan "added to her already demanding job responsibilities,"[9] Stratton has not explained how those tasks were beyond the reasonable expectations for her job. <u>See</u> <u>Suarez</u>, 229 F.3d at 55 ("An increase in work requirements that does not surpass reasonable expectations will not suffice to sustain a claim of constructive discharge."); <u>see also</u> <u>Greenberg</u> <u>v. Union Camp Corp.</u>, 48 F.3d 22, 27-28 (1st Cir. 1995) (rejecting constructive discharge claim where an employer required an employee to spend two additional days a week making sales calls).

---

[8] Many of our sister circuits have concluded that performance improvement plans, standing alone, do not establish a constructive discharge.  <u>See</u>, <u>e.g.</u>, <u>Agnew</u> v. <u>BASF Corp.</u>, 286 F.3d 307, 310 (6th Cir. 2002) ("[C]riticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions."); <u>Fischer</u> v. <u>Andersen Corp.</u>, 483 F.3d 553, 557 (8th Cir. 2007) ("An employee is not constructively discharged when an employer merely implements a [performance improvement plan]."); <u>Perret</u> v. <u>Nationwide Mut. Ins.</u>, 770 F.3d 336, 339 (5th Cir. 2014) (rejecting argument that a performance improvement plan established a constructive discharge); <u>Reynolds</u> v. <u>Dep't of Army</u>, 439 F. App'x 150, 153-54 (3d Cir. 2011) (same); <u>Miller</u> v. <u>Batesville Casket Co.</u>, 312 F. App'x 404, 406-07 (2d Cir. 2009) (same); <u>Saville</u> v. <u>Int'l Bus. Machs. Corp.</u>, 188 F. App'x 667, 670-71 (10th Cir. 2006) (same).

[9] Stratton asserts, for example, that the performance improvement plan required her "to generate a certain number of new marketing leads by attending events outside of her regular work hours."

Finally, Stratton argues that "her mental and physical health deteriorated" because her "attempts to remedy the disparate treatment were left unanswered."  She believed, on that basis, that "she had no other option but to leave her employment."  But the relevant question is not whether Stratton subjectively felt compelled to resign.  Instead, we must ask whether Stratton's working conditions became so objectively intolerable "that a reasonable person in her place would feel forced to resign." Gerald, 707 F.3d at 25 (emphasis added).  As we have explained, the answer here is no.

Indeed, Stratton herself insists that -- despite these supposedly intolerable work conditions -- she was able to perform her job adequately throughout her tenure.  And, amidst the tension in her workplace, Stratton applied for a different position at Bentley.  Despite making it to the final round of candidates, Stratton voluntarily withdrew her application.  By declining this alternate position, and instead choosing to stay at the UXC for some time, Stratton undermined her assertion that her job was so insufferable that she had no choice but to quit.  See EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014) (rejecting a constructive discharge theory because the plaintiff "actively disregarded" opportunities to resolve her job-related complaints by, for example, refusing her employer's "offer[] to discuss other work arrangements").

In short, the circumstances identified by Stratton, taken together or individually, do not show that Stratton's experience at Bentley was so intolerable that a reasonable person in her shoes would have felt compelled to resign.[10]  Because Stratton has not identified a cognizable adverse employment action beyond her alleged constructive discharge, the district court appropriately entered summary judgment against Stratton on her discrimination claims brought under Title VII and Chapter 151B.

### 2.  Retaliation

Stratton also asserts that Bentley retaliated against her for complaining to the human resources department about Gribbons and Albert's purported discriminatory conduct, citing in particular her placement on a performance improvement plan. Bentley counters that the performance improvement plan was directly related to Stratton's unsatisfactory work performance, well-documented by contemporaneous correspondence between her

---

[10]  Stratton's discrimination claims under Chapter 151B similarly fail because "she does not argue that the two claims should be treated differently." Ponte v. Steelcase Inc., 741 F.3d 310, 319 n.9 (1st Cir. 2014).  Moreover, the Massachusetts Supreme Judicial Court typically "appl[ies] Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. ch. 151B." Id. (quoting Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994)); see also GTE Prods. Corp. v. Stewart, 653 N.E.2d 161, 169 (Mass. 1995) ("In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (quoting Turner v. Anheuser-Busch, Inc., 876 P.2d 1022, 1027 (Cal. 1994))).

supervisors.

To succeed on her retaliation claim, Stratton must show that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007). As in the substantive discrimination context, the McDonnell-Douglas burden-shifting framework applies to retaliation claims. That is, once a plaintiff makes a prima facie case of retaliation, "the burden swings to the defendant 'to articulate a legitimate, non-retaliatory reason for its employment decision.'" Abril-Rivera v. Johnson, 806 F.3d 599, 608 n.10 (1st Cir. 2015) (quoting Gerald, 707 F.3d at 24). "If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor." Id. (quoting Gerald, 707 F.3d at 24).

The district court granted summary judgment in Bentley's favor on Stratton's retaliation claim for two reasons. First, the court found that Stratton did not suffer a "materially adverse" employment action. See Stratton, 2021 WL 6098974, at *4. Second, the court found that Stratton could not establish a "but-for" causal connection between the purported retaliatory actions and her complaints to Hatch. Id. at *5. Though the causation prong is ultimately dispositive here, we address both of the district

court's holdings because our avoidance of the "materially adverse action" prong would leave in place an untenable view of the Burlington Northern retaliation standard.  We therefore deem it important to first address Stratton's argument that the district court applied the wrong test for "materially adverse action."

### (a) Materially Adverse Action

In Burlington Northern, the Supreme Court considered whether Title VII's antiretaliation provision, like the substantive provision, "confine[s] actionable [conduct] to activity that affects the terms and conditions of employment." 548 U.S. at 57.  The Court answered in the negative.  Id. Concluding that "Title VII's substantive provision and its antiretaliation provision are not coterminous," id. at 67, the Court held that the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment," id. at 64.  Rather, it covers all "materially adverse" actions, including those not directly related to an employee's job.  Id. at 57.  An action is "materially adverse," the Court explained, if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.

The broader test for "materially adverse" retaliatory conduct accounts for the linguistic differences between the substantive provision and the retaliation provision in Title VII. Id. at 62.  Though the substantive provision contains terms that

"explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace," the Court observed that "[n]o such limiting words appear in the antiretaliation provision." Id. Nor would the statute's objective be achieved if an employer could simply "retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." Id. at 63.

Here, the district court did not assess whether Bentley's alleged retaliatory acts could dissuade a reasonable employee from complaining of discrimination. Instead, the court incorrectly viewed Stratton's evidence of retaliation through a narrower lens. As to her assertion that Gribbons and Albert escalated their hostility toward her after she complained to Hatch, the court held that Stratton did not show a level of harassment so "severe or pervasive" that it "materially altered the conditions of her employment." Stratton, 2021 WL 6098974, at *4 (quoting Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005)). The court further explained that Stratton's negative performance reviews, increased job responsibilities, and performance improvement plan were not materially adverse because none of those actions imposed a "tangible negative consequence[] . . . like being docked pay, benefits, or decreased job responsibilities." Id.

The _Burlington Northern_ test is not so strict.  To start, the district court's "severe or pervasive" standard, while appropriate for hostile work environment claims under Title VII's _substantive_ provision, _see_ _Meritor Sav. Bank, FSB_ v. _Vinson_, 477 U.S. 57, 67 (1986), does not apply to _retaliation_ claims.  Rather, as many other circuits have now recognized, the _Burlington Northern_ "might-have-dissuaded" standard applies to "all Title VII retaliation claims," _Monaghan_ v. _Worldpay US, Inc._, 955 F.3d 855, 862 (11th Cir. 2020) (per curiam), even those labeled as "retaliatory hostile work environment" claims, _Carr_ v. _New York City Transit Auth._, 76 F.4th 172, 181 (2d Cir. 2023).[11]

It is true that in _Noviello_ v. _City of Boston_, a pre-_Burlington Northern_ case, we required retaliatory harassment to be so "severe or pervasive" that it altered the conditions of the victim's employment.  _Noviello_, 398 F.3d at 92.  We also acknowledge that we have continued to recite and apply _Noviello_'s "severe or pervasive" standard in some post-_Burlington Northern_

---

[11] _See also_ _Poullard_ v. _McDonald_, 829 F.3d 844, 858 (7th Cir. 2016) (applying _Burlington Northern_ standard to claim of retaliation in the form of harassment); _Hawkins_ v. _Anheuser-Busch, Inc._, 517 F.3d 321, 347 (6th Cir. 2008) ("As _Burlington Northern_ made clear, . . . the tests for [discriminatory] harassment and retaliation are not coterminous."); _Martinelli_ v. _Penn Millers Ins._, 269 F. App'x 226, 230 (3d Cir. 2008) (noting that "employees claiming retaliation by workplace harassment are no longer required to show that the harassment was severe or pervasive enough to constitute a violation of Title VII's anti-discrimination provision").

retaliation decisions.   See, e.g., Roman, 604 F.3d at 42.   In other cases, while faithfully reciting the Burlington Northern retaliation standard, we still incorporated elements of a substantive discrimination analysis by requiring retaliatory harassment to be "severe or pervasive enough to constitute a . . . hostile work environment." Rivera-Rivera, 898 F.3d at 96; see also Alvarado v. Donahoe, 687 F.3d 453, 461 (1st Cir. 2012). None of these post-Burlington Northern decisions citing Noviello, however, directly involved the issue of Burlington Northern's broader retaliation standard.   On other occasions, we have faithfully applied Burlington Northern's standard.   See, e.g., Dixon, 504 F.3d at 82 ("[T]he language of Title VII's retaliation provision, unlike the discrimination provision, is not limited to workplace conditions; it simply prohibits employers . . . from discriminating broadly against employees . . . in retaliation for their pursuit of discrimination claims."); Billings v. Town of Grafton, 515 F.3d 39, 54 (1st Cir. 2008) (recognizing that retaliation "need not relate to the terms or conditions of employment").[12]  Given the muddled state of our case law on this issue, we take the opportunity here to say, definitively, that Noviello's standard in the retaliation context is no longer

---

[12] We credit the helpful amicus brief from the Equal Employment Opportunity Commission in identifying this tension in our precedent.

appropriate.[13]

Hence, as Burlington Northern's "might-have-dissuaded" standard unequivocally applies to all Title VII retaliation claims, the appropriate question here, if addressed, would be whether Gribbons and Albert's actions would have dissuaded a reasonable employee from making a complaint of discrimination. See Burlington Northern, 548 U.S. at 57; see also Billings, 515 F.3d at 54 n.13 ("Of course, retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment.").  In answering that question, we would have to keep in mind that retaliation need not have "a dramatic impact" on a plaintiff's job or even "relate to the terms or conditions of employment." Billings, 515 F.3d at 54.  And "intensification of [preexisting] harassment" can be actionable as retaliation so long as it could dissuade a reasonable employee from engaging in protected activity.  Agusty-Reyes v. Dep't of Educ., 601 F.3d 45, 57 (1st Cir. 2010); see also Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 31 (1st Cir. 2011) (reiterating that "the escalation of a supervisor's harassment on

---

[13] Our repudiation of Noviello's retaliation standard need not involve the full court.  Though one function of en banc review is to "secure and maintain uniformity of the court's decisions," Fed. R. App. P. 35(b)(1)(A), a successor panel may, on its own, recognize that an intervening opinion of the Supreme Court cuts against the precedential value of a prior panel decision.  Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc).

the heels of an employee's complaints about the supervisor is a sufficiently adverse action to support a claim of employer retaliation," even absent "a tangible employment detriment").

Each case must be decided on its own facts. Compare Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178 (1st Cir. 2015) (holding that Burlington Northern's standard was satisfied where superiors "criticized [the plaintiff] about her work performance, screamed at her in front of her colleagues, and made multiple threats to fire her"), with Bhatti, 659 F.3d at 73 (explaining that Burlington Northern was not satisfied where criticism of the plaintiff carried "no consequences"). Whether the record in this case supports such assertions of retaliation is another matter. We do not opine on whether Stratton furnished enough evidence to establish the materially adverse action prong because her retaliation claim ultimately fails for lack of causation.

### (b) Causation

Retaliation claims under Title VII and Massachusetts state law require proof that the "protected activity was a but-for cause of the alleged adverse action by the employer." Ing, 81 F.4th at 84 n.5 (quoting Theidon v. Harvard Univ., 948 F.3d 477, 506 (1st Cir. 2020)). Unlike a substantive discrimination claim, a retaliation claim cannot rest on evidence that a plaintiff's protected activity was merely one of the employer's

motivations for an adverse action.  Univ. of Tex. Sw. Med. Ctr.
v. Nassar, 570 U.S. 338, 359-60 (2013) (distinguishing between the
"motivating-factor" and "but-for" causation standards).  Put
simply, a plaintiff must show that their employer would not have
taken the adverse action but for a desire to retaliate.  Id. at
352, 360.  Such a standard protects against a poor-performing
employee shielding themselves from termination by the mere fact
that they engaged in protected conduct.  Id. at 358 ("Consider in
this regard the case of an employee who knows that he or she is
about to be fired for poor performance . . . .  To forestall that
lawful action, he or she might be tempted to make an unfounded
charge of racial, sexual, or religious discrimination; then, when
the unrelated employment action comes, the employee could allege
that it is retaliation.").

        Here, Stratton cannot satisfy the requirements of "but-
for" causation.  It is true that an inference of causation may be
appropriate where there is close temporal proximity between
protected activity and an adverse action.  Pomales v. Celulares
Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006).  However, such
an inference requires "proof that the decisionmaker knew of the
plaintiff's protected conduct when he or she decided to take the
adverse employment action."  Id.  Without evidence of a
decisionmaker's knowledge of the protected conduct, the adverse
action "could not have been caused by a desire to retaliate

against" the plaintiff.  Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 73 (1st Cir. 2011).

Stratton did not complain of discrimination directly to her supervisors, nor was it Hatch's idea to place Stratton on a performance improvement plan.  And no reasonable jury could conclude that Hatch informed Gribbons or Albert of Stratton's complaints about discrimination.  Hence, there is a missing link between Stratton's complaints to Hatch and the decision by Gribbons and Albert to enroll her in a performance improvement plan. Stratton conflates her complaints about Gribbons's management style with her complaints accusing Gribbons of discrimination.[14] Gribbons admits he was aware of the former -- and would even let his own supervisor, Dean Moore, know when Stratton complained about

_____

[14] We note that the district court, citing its own Local Rule 56.1 (D. Mass. 2023), declined to consider some evidence of retaliation because Stratton referenced such evidence only in her "Supplemental Statement of Facts." Stratton, 2021 WL 6098974, at *1 n.1.  Local Rule 56.1, as interpreted by the district court, does not contemplate the "submission of a separate statement of undisputed facts [by the opposing party]." Id. (alterations in original) (quoting Plourde v. Sorin Grp. USA, 517 F. Supp. 3d 76, 81 (D. Mass. 2021)).  We treat a district court's application of its local rules with deference, Carreras v. Sajo, García & Partners, 596 F.3d 25, 31 (1st Cir. 2010), and we have warned litigants to ignore those rules "at their peril." López-Hernández v. Terumo P.R. LLC, 64 F.4th 22, 26 (1st Cir. 2023) (quoting Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 219 (1st Cir. 2007)).  Stratton, though citing her Supplemental Statement of Facts on appeal, does not challenge the district court's disregard of evidence identified only in her Supplemental Statement of Facts.  We need not decide the correctness of this disregard, however, because even considering the full record, Stratton still cannot prevail on her claims.

his management tactics.  But as to the latter, Gribbons and Hatch both made clear that the human resources department conveyed to Gribbons <u>only</u> Stratton's complaints about her workload, not Gribbons's alleged discrimination.  Needless to say, Title VII's retaliation provision does not protect an employee's right to make run-of-the-mill complaints about their supervisor's management style.  <u>Cf.</u> <u>Planadeball</u>, 793 F.3d at 175 (noting that Title VII's retaliation provision extends to "protected conduct," which "refers to action taken to protest or oppose statutorily prohibited discrimination" (quoting <u>Fantini</u> v. <u>Salem State Coll.</u>, 557 F.3d 22, 32 (1st Cir. 2009))).  Though Stratton insists that Gribbons knew of other employees who had made complaints about him to the human resources department, nothing in the record suggests Gibbons was aware of Stratton's concerns about discrimination.

    We have described the burden of establishing a prima facie case of retaliation as "light."  <u>DeCaire</u> v. <u>Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008) (quoting <u>Mariani-Colón</u> v. <u>Dep't of Homeland Sec. ex rel. Chertoff</u>, 511 F.3d 216, 224 (1st Cir. 2007)).  Nevertheless, Stratton must still satisfy the requirements of a nonmoving party in opposing summary judgment.  Absent evidence that Gribbons knew about Stratton's own complaints of discrimination, no reasonable jury could conclude that Stratton's protected conduct was the but-for cause of the purportedly adverse actions taken by Bentley.  Thus, summary judgment was

appropriately entered in Bentley's favor because Stratton has not satisfied the prima facie causation requirement of her Title VII retaliation claim.[15]

## B. FMLA Claims

The FMLA was enacted to help workers "balance the demands of the workplace with the needs of families," among other purposes. See 29 U.S.C. § 2601(b)(1). The statute provides several substantive rights to employees, including the right to take leave for medical reasons. Id. § 2612(a)(1). As relevant here, the FMLA entitles an "eligible employee . . . to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id.[16] This sort of FMLA leave "may be taken intermittently or on a reduced leave schedule when medically necessary." Id. § 2612(b)(1). To protect these rights, the FMLA and its associated regulations make it unlawful for an employer to, among

---

[15] Because a prima facie case of retaliation under Chapter 151B is identical to Title VII, Stratton also cannot prevail on her retaliation claims under Massachusetts law. See Theidon, 948 F.3d at 508 (citing Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 793 (Mass. 2016)).

[16] A "serious health condition," in this context, "means an illness, injury, impairment, or physical or mental condition that involves -- (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

other things: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA right ("interference claims" or "substantive claims"), id. § 2615(a)(1); or (2) "discriminat[e] or retaliat[e] against an employee . . . for having exercised or attempted to exercise FMLA rights" ("retaliation claims"), 29 C.F.R. § 825.220(c); see also 29 U.S.C. § 2615(a)(2).

We have recognized that, in some cases, interference and retaliation claims will overlap. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 (1st Cir. 2005) ("The term 'interference' may, depending on the facts, cover both retaliation claims and non-retaliation claims." (citations omitted)).  Generally, interference claims ask whether an employer "provided its employee the entitlements set forth in the FMLA," Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998), or, in some cases, whether an employer "discourag[ed]" its employee from exercising rights guaranteed under the FMLA, see id. at 160 n.4 (quoting 29 C.F.R. § 825.220(b)).  Retaliation claims, on the other hand, typically assert that an employer took an adverse action against its employee because that employee exercised, or attempted to exercise, rights guaranteed by the FMLA.  See Colburn, 429 F.3d at 332.  The practical consequence is this: unlike FMLA interference cases, "[i]n an FMLA retaliation case, the employer's intent –– i.e., why the employer fired or acted

against the employee -- matters." Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014); see also Colburn, 429 F.3d at 331 ("To meet his or her burden in an interference with substantive rights claim, a plaintiff need only show, by a preponderance of the evidence, entitlement to the disputed leave; no showing as to employer intent is required.").

Here, Stratton claims that Bentley both interfered with her right to take leave under the FMLA and that Bentley retaliated against her for taking such leave.

### 1.   FMLA Interference

Stratton contends that her supervisors interfered with her right to FMLA leave by subjecting her to an escalation of hostile treatment once she requested FMLA leave.  Those actions, Stratton argues, discouraged her from exercising her FMLA rights. The district court rejected Stratton's interference claim because: (1) her request for leave was approved once she submitted the required documentation, and (2) Stratton ultimately used that FMLA leave to attend each of her medical appointments. Stratton, 2021 WL 6098974, at *5.

Even assuming that, as Stratton argues, the district court incorrectly dismissed her FMLA interference claim based on the fact that she eventually received approval for FMLA leave, see Ziccarelli v. Dart, 35 F.4th 1079, 1086 (7th Cir. 2022), Stratton's claim fails because, put simply, nothing in the record suggests

Bentley "discouraged" her from taking FMLA leave at all.  See, e.g., Quinn v. St. Louis Cnty., 653 F.3d 745, 753 (8th Cir. 2011); Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 593 (11th Cir. 2017).  To the contrary, Bentley approved Stratton's request for FMLA leave within days and with no apparent opposition once she submitted the required documentation.[17]  Because Stratton requested leave to address a serious health condition, the FMLA allowed Bentley to request a certification from her health care provider stating, among other things, "the probable duration of the condition."  See 29 U.S.C. § 2613(a), (b)(2).  Bentley's request for further information was thus not "so discouraging that it interfered with appellant's right to leave under the FMLA." Sherrod v. Phila. Gas Works, 57 F. App'x 68, 73 (3d Cir. 2003) (no interference where employer initially denied leave due to employee's lack of proper notice but ultimately granted leave once properly apprised of employee's eligibility).

Unlike in cases where decisionmakers or human resources representatives discouraged employees from taking FMLA leave, Stratton has pointed to no direct evidence that her supervisors had a problem with her attending medical appointments.  See, e.g.,

---

[17] Stratton requested FMLA leave on January 22, 2018.  In response, Bentley requested additional documentation.  Stratton filed the necessary documents to support her leave request on February 7, 2018, and Bentley approved that request for intermittent leave on February 8, 2018.  As noted, Stratton was placed on a performance improvement plan on May 22, 2018.

Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 818 (7th Cir. 2015) (sufficient interference where employer threatened an employee with "repercussions" if he "took off again" to care for his child); McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 7 (D.C. Cir. 2010) (sufficient interference where a human resources representative told employee it was "going to be a problem" if she missed work to care for her husband).   Though Stratton generally asserts she was subject to "an escalation of hostile treatment" after taking FMLA leave,[18] she provides no sense of when these alleged acts of hostility occurred or what specifically they entailed.   See Villeneuve v. Avon Prod., Inc., 919 F.3d 40, 54 (1st Cir. 2019) (explaining that a plaintiff "cannot defeat a summary-judgment motion with 'conclusory allegations' or 'unsupported speculation'" (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))); cf. Ziccarelli, 35 F.4th at 1090 (concluding that there was sufficient evidence of a link between a supervisor's alleged discouragement and the plaintiff's decision not to take his remaining FMLA leave).

Separately, Stratton claims that Bentley denied "her FMLA request[s] to work from home."   Though her precise contention is somewhat unclear, Stratton seems to argue that her requests to

---

[18] This assertion provides an example of the potential overlap between interference claims and retaliation claims, as discussed previously.   See Colburn, 429 F.3d at 331.

work from home were in fact requests for leave under the FMLA. However, Stratton has not developed any argument for why her requests to work from home implicate the leave provisions of the FMLA, a particular necessity in light of out-of-circuit precedent rejecting such an application of the FMLA.[19]  She has therefore forfeited any such claim.  See Zannino, 895 F.2d at 17.

In sum, the district court properly entered summary judgment for Bentley on Stratton's FMLA interference claim, not only because Bentley approved her requested leave but also because the record contains no evidence that Bentley discouraged Stratton from requesting leave in the first place.

### 2.   FMLA Retaliation

Stratton also contends that Gribbons and Albert retaliated against her because she requested and took FMLA-authorized leave.  As evidence, Stratton points to her placement on a performance improvement plan three and a half months after Bentley approved her request for leave.

To make out a prima facie case of FMLA retaliation, an employee must show: "(1) she availed herself of a protected FMLA right; (2) she was 'adversely affected by an employment decision,'

---

[19] See, e.g., Anderson v. McIntosh Constr., LLC, 597 F. App'x 313, 314 (6th Cir. 2015); Taylor-Novotny v. Health All. Med. Plans, Inc., 772 F.3d 478, 498 (7th Cir. 2014).  We also note that this court has taken a similar position in an unpublished opinion.  See Garland-Gonzalez v. Universal Grp., Inc., No. 19-1998, 2024 WL 3252657, at *1 (1st Cir. July 1, 2024) (per curiam).

and (3) 'there was a causal connection between [her] protected conduct and the adverse employment action.'"  Carrero-Ojeda, 755 F.3d at 719 (alteration in original) (quoting Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 107 (1st Cir. 2006)).  Where, as here, direct evidence of retaliation does not exist, courts apply the same McDonnell Douglas burden-shifting framework described above.  See Colburn, 429 F.3d at 335-36.

In rejecting Stratton's FMLA retaliation claim, the district court explained that Stratton had no evidence of causation other than the temporal proximity between her use of FMLA leave and the imposition of the performance improvement plan, the purported retaliatory action.  Stratton, 2021 WL 6098974, at *5-6.  The district court, reasoning that "[c]hronological proximity does not by itself establish causality," concluded that Stratton could not make out a prima facie case for her FMLA retaliation claim.  Id. at *6 (alteration in original) (quoting Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 85 (1st Cir. 2005)).

Unlike the district court, we assume without deciding that Stratton established a prima facie case of FMLA retaliation -- i.e., that (1) she availed herself of a protected FMLA right, (2) her performance improvement plan was a sufficiently

adverse action,[20] and (3) a causal link connects these events.  See Ameen v. Amphenol Printed Circs., Inc., 777 F.3d 63, 69 (1st Cir. 2015).  As for its nondiscriminatory justification, Bentley claims that Stratton was placed on a performance improvement plan because her supervisors held a long-standing perception of her poor job performance.  We thus focus on Stratton's obligation to show pretext, the final stage of the McDonnell Douglas framework.

The evidence Stratton cites is inadequate to show that Gribbons and Albert's perception of her poor job performance was a pretext to retaliate against her for using FMLA leave.  Stratton relies on the simple fact that she was enrolled in a performance improvement plan three and a half months after her FMLA leave was approved -- seemingly suggesting that this chronological gap is sufficiently brief to render the connection between the two events obvious.  To be sure, a "very close temporal proximity," Germanowski v. Harris, 854 F.3d 68, 74 (1st Cir. 2017) (alteration and internal quotation marks omitted) (quoting Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012)), may be sufficient to "meet the relatively light burden of establishing

_____

[20] Stratton also argues that, once she took FMLA leave, Gribbons and Albert became increasingly hostile toward her. However, we focus only on Stratton's performance improvement plan as the relevant adverse action because, as discussed above, Stratton's evidence of such increased hostility is far too conclusory and vague to create a genuine dispute of fact.  See Villeneuve, 919 F.3d at 54.

a prima facie case of retaliation," <u>DeCaire</u>, 530 F.3d at 19 (quoting <u>Mariani-Colón</u>, 511 F.3d at 224).[21]  However, the temporal proximity identified here cannot meet the ultimate burden of proving an employer was motivated by discrimination.  <u>Cf.</u> <u>Carrero-Ojeda</u>, 755 F.3d at 720 ("But while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough -- especially if the surrounding circumstances undermine any claim of causation.").

Here, undisputed evidence establishes that Gribbons and Albert had raised concerns about Stratton's performance well before she requested FMLA leave in January 2018.  As early as December 2016, only four months after hiring Stratton, Gribbons told Albert via email that he "continue[d] to worry about [Stratton's] use of time."  Indeed, contemporaneously recorded email exchanges memorialized Gribbons and Albert's negative perception of Stratton's performance long before Stratton

---

[21] We have held that certain amounts of time may be too long to satisfy the causation element of a prima facie case.  <u>See</u>, <u>e.g.</u>, <u>López-Hernández</u>, 64 F.4th at 32 (four and a half months insufficient to establish causation); <u>Pena</u> v. <u>Honeywell Int'l, Inc.</u>, 923 F.3d 18, 32 (1st Cir. 2019) ("The gap of four months, on its own, is not 'very close' for establishing causality."); <u>Ahern</u>, 629 F.3d at 58 ("[A] gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action.").  Given our focus on the final stage of the <u>McDonnell Douglas</u> framework, we do not opine on whether the three and a half months between Bentley's approval of Stratton's FMLA leave and her placement on a performance improvement plan is too long to create an inference of causation for her prima facie case.

requested leave.  See Hodgens, 144 F.3d at 169-70 (holding that a plaintiff failed to show an employer's well-documented nondiscriminatory justification was pretextual).

By contrast, Stratton does not identify in the record any "negative comments, complaints, or expressions of reluctance by [Stratton's] superiors or co-workers about her FMLA leave-taking." Carrero-Ojeda, 755 F.3d at 720.  Put simply, Stratton was not "an employee with an unblemished record and steady performance who, shortly after requesting FMLA leave, [wa]s [subjected to an adverse employment action] by her employer without explanation." Germanowski, 854 F.3d at 74.  Though Stratton provides evidence suggesting that her workload was so heavy it was impossible to manage during the standard workday, any unfairness in the perception of her performance by her supervisors is immaterial.  The key point is that Stratton identifies nothing in the record that puts in dispute the perception of her supervisors, justifiable or not, that her performance was lacking before she requested or took FMLA leave.  See Carrero-Ojeda, 755 F.3d at 720-21 (no retaliation where the alleged retaliatory animus pre-existed the plaintiff's attempt to take FMLA leave); Germanowski, 854 F.3d at 75 (explaining that a plaintiff's FMLA claim, as alleged, lacked causation in part due to "an emotionally fraught and longstanding dispute between the employer and the employee" pre-dating the request for FMLA leave).

In short, although we depart from the district court's focus on Stratton's prima facie case, we conclude that no rational jury could ultimately find that Gribbons and Albert's justification for enrolling Stratton in a performance improvement plan was a pretext to retaliate against her for taking FMLA-protected leave.  We thus affirm the district court's entry of summary judgment as to Stratton's FMLA retaliation claim.

## C.  Disability Discrimination Claims

Stratton next claims her supervisors fostered a hostile work environment based on her disability in violation of the ADA.[22] She also asserts that Bentley failed to accommodate her disability in violation of the ADA and Massachusetts General Laws Chapter 151B.[23]  In assessing both claims, we assume without deciding that

---

[22] As we have done for nearly two decades, we assume without deciding that a plaintiff may raise a disability discrimination claim based on a hostile work environment theory under the ADA. See, e.g., Quiles-Quiles v. Henderson, 439 F.3d 1, 5 n.1 (1st Cir. 2006); Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 43-44 (1st Cir. 2011); Murray v. Warren Pumps, LLC, 821 F.3d 77, 86 n.1 (1st Cir. 2016); see also Barton v. Clancy, 632 F.3d 9, 20 n.7 (1st Cir. 2011) ("The SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16).").  In so doing, we note that "[e]very other circuit to decide the question has held that it is possible to bring an ADA claim for a hostile environment." Ford v. Marion Cnty. Sheriff's Off., 942 F.3d 839, 851 (7th Cir. 2019) (collecting cases).

[23] Stratton's First Amended Complaint also raises a disability discrimination claim based on the ADA Amendments Act of 2008 (Count V) and a retaliation claim based on Massachusetts General Laws Chapter 151B (Count VII).  However, she develops no distinctive argument concerning these claims on appeal.

Stratton's pelvic pain qualifies as a disability.

### 1. Hostile Work Environment

To prevail on her hostile work environment claim, Stratton agrees she must show that (1) she belonged to a protected class (in this context, that she was a qualified individual with a disability); (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and Stratton in fact perceived it to be so; and (6) that some basis for employer liability has been established. See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (listing elements for hostile work environment claim in the Title VII context); see also Murray, 821 F.3d at 86 (importing elements from a Title VII hostile work environment claim into the ADA context).[24]

---

[24] The parties appear to agree that the principles guiding hostile work environment claims in the Title VII context are generally applicable to hostile work environment claims under the ADA. See 1 Janet Arterton & Gary Phelan, Disability Discrimination in the Workplace § 2:18 (2023) ("Assuming that a hostile work environment claim is cognizable under the ADA, an employee must follow the methodology already established by the Supreme Court in the parallel area of Title VII litigation."); see also Ford, 942 F.3d at 852 ("The claim's legal basis is simple: Congress wrote the ADA using the language of Title VII, and Title VII recognizes hostile work environment claims.").

In granting summary judgment in Bentley's favor on Stratton's disability-based hostile work environment claim, the district court explained, among other reasons, that Stratton did not identify "any comments or conduct related to her asserted disability." Stratton, 2021 WL 6098974, at *6.  We agree with that assessment.  Stratton cannot satisfy the third element of a hostile work environment claim because she offers no evidence that her supervisors' reported comments were based on or even related to her disability, i.e., her pelvic pain.[25]  To state the obvious, not one of the identified remarks mentions her disability, or anyone's disability, for that matter.  Cf. Quiles-Quiles, 439 F.3d at 8 (holding that relentless ridicule from superiors who "frequently mention[ed] [the plaintiff's] disability" established hostile work environment based on disability).  And, as previously mentioned, several comments were not even about her.  Nor has Stratton made any effort to establish that any of these comments were made after she disclosed her disability.  Stratton simply assumes that these "snide comments" establish a discriminatory environment without providing the "surrounding details to place the remarks in context."  Murray, 821 F.3d at 87 (rejecting

---

[25] As described above, Gribbons made negative remarks about the Brockton School District, publicly reprimanded Stratton about her laptop usage, and referred to another employee as a "dinosaur." In addition, Gribbons and Albert both described Stratton's job as "different" and noted that she was "not similar to the staff at the UXC."

disability-based hostile work environment claim where supervisor told plaintiff that he "could work faster" and "accomplish more" if he spent more time at the shop).

Of course, discrimination sometimes operates in subtle ways and a hostile work environment may encompass disability-based harassment that does not explicitly reference a person's disability. See O'Rourke, 235 F.3d at 729 ("[H]arassment that is not overtly sexual is nonetheless actionable under Title VII," just as "conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim." (quoting Landrau-Romero, 212 F.3d at 614)).  But even with every inference drawn in Stratton's favor, no reasonable jury could find any connection between the alleged harassment and Stratton's disability.  See Ríos-Jiménez v. Principi, 520 F.3d 31, 44 (1st Cir. 2008) (affirming grant of summary judgment because plaintiff failed to produce evidence that any hostile conduct "was related to her alleged disability").  Accordingly, the district court correctly entered summary judgment in favor of Bentley as to Stratton's hostile work environment claim.

### 2.    Failure to Accommodate

The parties appear to agree that Stratton brought a failure to accommodate claim under both the ADA and Chapter 151B. The ADA and Chapter 151B each prohibit discrimination based on

disability or handicap, respectively. 42 U.S.C. §§ 12101-12117;
Mass. Gen. Laws ch. 151B, § 4(16).[26]  Under both statutes, an
employer is required to provide an employee with a known disability
a reasonable accommodation that will enable her "to perform the
essential functions of [her] job" unless the accommodation would
cause the employer undue hardship.  Godfrey v. Globe Newspaper
Co., 928 N.E.2d 327, 333 (Mass. 2010) (citing Mass. Gen. Laws ch.
151B, § 4(16)); Murray, 821 F.3d at 84 (applying the same standard
to ADA claims).  To prevail on her failure-to-accommodate claim,
Stratton must show that: "(1) [s]he is disabled within the meaning
of the [applicable statute], (2) [s]he was able to perform the
essential functions of the job with or without a reasonable
accommodation, and (3) [the defendant], despite knowing of [the
plaintiff]'s disability, did not reasonably accommodate it."
Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st
Cir. 2007) (fourth and fifth alterations in original) (quoting
Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)); accord
Alba v. Raytheon Co., 809 N.E.2d 516, 522 n.9 (Mass. 2004) (noting

---

[26] Chapter 151B is the "Massachusetts analogue" to the ADA,
Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153 (1st
Cir. 2009), and "[t]he Supreme Judicial Court of Massachusetts has
indicated that federal case law construing the ADA should be
followed in interpreting the Massachusetts disability law," Ward
v. Mass. Health Rsch. Inst., 209 F.3d 29, 33 n.2 (1st Cir. 2000).
Accordingly, we analyze claims under the ADA and Chapter 151B using
the same framework and use the terms "disability" and "handicap"
interchangeably.  See Sarkisian v. Austin Preparatory Sch., 85
F.4th 670, 675 (1st Cir. 2023).

that, under Massachusetts law, a failure-to-accommodate claim also requires proof that "as a result of th[e] refusal [to accommodate], [the plaintiff] suffered some harm").

The district court held that Stratton could not satisfy the third element of her claim, the failure to provide a reasonable accommodation. The court explained that Bentley provided Stratton with a reasonable alternative accommodation in February 2018 by allowing her to work in other on-campus buildings. See Stratton, 2021 WL 6098974, at *7. Stratton, by her own admission, was able to work in those buildings without sitting at a 90-degree angle, thus helping to relieve her pelvic pain. On that basis, the district court determined that Bentley had neither rejected a request for a reasonable accommodation nor caused Stratton any harm. See id.

In challenging the district court's reasoning, Stratton first argues that Bentley should be liable for denying her request to modify her schedule in November 2016 and her request to work from home in November 2017. These prior denials, Stratton argues, triggered Bentley's liability under the ADA and Chapter 151B even if Bentley ultimately provided a reasonable accommodation in February 2018. Separately, Stratton asserts that, once she started working in other on-campus buildings, Albert reprimanded her for utilizing the alternative accommodation and not being present in the office. She thus questions whether Bentley ever

actually accommodated her disability.  We address each of these arguments in turn.

### (a) Stratton's 2016 and 2017 Requests

In arguing that Bentley denied her requests for accommodation in 2016 and 2017, Stratton both mischaracterizes the record and misstates the requirements of a reasonable accommodation claim.  With respect to her November 2016 request, Stratton allegedly "approached Albert to address her concerns about her workload and schedule because it was inflicting negative effects on her physical and mental health and for which she received medical treatment."  This brief conversation does not constitute a request for a reasonable accommodation.  For one, Stratton expressly waived the argument that she requested an accommodation for a mental health condition.  See Mot. to Compel Hr'g Tr. at 13:21-23 ("This is not our case here, we do not have a mental health disability alleged by the plaintiff."); id. at 14:14-17 ("If there's any mental health disability, certainly that would -- that would change the whole scope of the waiver analysis, if that was the disability she was in fact alleging.  She is not alleging that.").  And with respect to her physical disability, Stratton told her doctor that her pelvic pain began in August 2017 -- nearly a year after this alleged conversation occurred.

However, even assuming Stratton began experiencing pelvic pain before the November 2016 conversation, it would not

make a difference.  That is because Stratton's request for a schedule change based on her workload's "negative effects on her physical and mental health" was far too generalized to trigger Bentley's relevant responsibilities.  See Murray, 821 F.3d at 84 ("[W]e set aside those portions of [the plaintiff's] deposition testimony that only broadly suggest requests for accommodation."). Typically, an employer's obligation to make a reasonable accommodation arises only when an employee provides a "sufficiently direct and specific" request for the needed accommodation.  Tobin v. Liberty Mut. Ins., 553 F.3d 121, 129 (1st Cir. 2009) (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)); see also Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 271 n.21 (Mass. 2004) ("[F]or an employee's actions to constitute a request for accommodation, they must make the employer aware that the employee is entitled to and needs accommodation.  Specifically, the request must let the employer know that the employee is a qualified handicapped person . . . .").[27]  "At the least, the request must explain how the accommodation requested is linked to some disability."  Reed, 244 F.3d at 261.

---

[27] "Different rules may apply in situations where a disability prevents the employee from requesting an accommodation, or where the need for an accommodation is obvious."  Freadman, 484 F.3d at 102 n.11.  Stratton's pelvic pain falls under neither of those exceptions.

Stratton's vague assertion that her workload had "negative effects on her health" makes no mention of pelvic pain, or any sort of disability for that matter. Hence, Bentley had "no duty to divine the need for a special accommodation" based on Stratton's general request for a reduced workload in November 2016. Id.; see also Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 64 (1st Cir. 2004) (rejecting failure-to-accommodate claim where plaintiff asked for a reduced workload without expressly tying the request to her depression).

Stratton's November 2017 request to work from home, though more specific than her request for a schedule change, similarly failed to identify a particular disability necessitating accommodation. That request was accompanied by a brief letter from her doctor stating that, "[d]ue to a medical condition, Ms. Stratton should not sit for long periods of time and would benefit from working at home one or two days a week if needed." In response, Hatch informed Stratton that Bentley's ADA policy required her to provide more information related to the nature of her disability. Yet Stratton's next letter from her doctor, dated January 18, 2018, still provided no information about her condition. That letter simply stated that Stratton "will need to work [at] home" so she could attend physical therapy "for her medical condition."

We have rejected similarly vague requests for

accommodation in prior cases.  Our decision in Jones v. Nationwide Life Insurance Co., 696 F.3d 78 (1st Cir. 2012), for example, involved a manager at an insurance company, Mark Jones, who lived with brachial plexus palsy -- a condition causing chronic pain in Jones's left arm.  Id. at 82.  After Jones broke his left shoulder in a fall, he underwent several surgeries and took morphine and oxycodone to manage the pain.  Id.  He unsuccessfully asked his supervisor for more time to complete a job-related licensing exam because his "recent medical condition and resulting treatment impacted [him] more than [he] would care to admit."  Id. at 85. Specifically, Jones noted that his aggressive treatment plan, including his prescription painkillers, made him unable to concentrate on the exam material.  Id.  In rejecting his failure-to-accommodate claim, we explained that Jones's email, despite being "direct and specific in its request for an extension of time," failed to link his requested accommodation to brachial plexus palsy, his disability at issue in the litigation.  Id. at 89; see also Reed, 244 F.3d at 262 (rejecting failure-to-accommodate claim where plaintiff did not inform her supervisors that her anger management problems were due to bipolar disorder).

The same is true here.  Stratton's reference to an unnamed medical condition does not entitle her to an accommodation. She needed to link the requested accommodation to a disability, not merely invoke vague references to medical conditions or unnamed

medical treatments.  See Jones, 696 F.3d at 89 (noting an employee must provide their employer more than mere "notice of a condition" but also explain the "causal connection" between the asserted disability and the requested accommodation (quoting Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 880 (4th ed. 2007))); see also Miceli v. JetBlue Airways Corp., 914 F.3d 73, 83 (1st Cir. 2019) ("[A] request must illuminate the linkage between the requestor's disability and the requested accommodation.").  After all, it would be difficult for an employer to discuss potential accommodations without having a more specific idea of the employee's disability.

Though not a requirement in every case, employers may need to "initiate an informal, interactive process" with employees seeking accommodations for a disability.  29 C.F.R. § 1630.2(o)(3).[28]  Stratton claims that Bentley "failed to engage in a meaningful and interactive dialogue regarding her requested reasonable accommodations."  As we have explained, however, prior to February 2018, none of Stratton's requests put Bentley on notice

---

[28] Though we have explained that the ADA "sometimes" requires employers to "engage in an interactive process" when an employee requests a workplace accommodation, Kohl's, 774 F.3d at 132 (quoting Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008)), our circuit "does not regard an employer's participation in the interactive process as an absolute requirement under the ADA," id. at 132 n.5.  We instead "resolve the issue on a case-by-case basis."  Id. (quoting Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001)).

that she was seeking a reasonable accommodation for any specific disability. Thus, this argument "fails for the same reasons as articulated above: the employer's duty to enter into an interactive process typically must be triggered by a sufficient request for accommodation, as with the employer's more general duty to accommodate." Reed, 244 F.3d at 262 n.11.

### (b) The Reasonableness of Stratton's Accommodation

Finally, Stratton argues that the accommodations Bentley did provide her with in response to her February 2018 request were insufficient. It is undisputed that, as recommended by Stratton's doctor, Bentley allowed her to work in alternative locations around campus where she would not have to sit at a 90-degree angle. Stratton argues, however, that this accommodation was "interfered with" because Albert "reprimanded her for utilizing this accommodation and not being present in the office." As a general proposition, there is force to that argument: "once an employer agrees to provide a particular accommodation, it must act reasonably in implementing said accommodation." Enica v. Principi, 544 F.3d 328, 342 (1st Cir. 2008). If an employer reprimands an employee for using an approved accommodation, the implementation of that "accommodation" would hardly be reasonable.

Yet Stratton's position is unsubstantiated by the record. Gribbons and Albert simply asked where Stratton was working on campus, and they reprimanded her only when she refused

to provide that information.[29]  Bentley explained that Gribbons
and Albert needed to know Stratton's location on campus because
she was occasionally unresponsive to time-sensitive email
inquiries.  In those situations, Gribbons and Albert needed some
other way to communicate with Stratton -- such as walking to the
nearby conference room or library for a face-to-face conversation.
Though Stratton may have preferred to not disclose where she was
working on campus, Bentley was not obligated to accommodate such
a preference because it was unrelated to her claimed disability.
See Orta-Castro, 447 F.3d at 112-13 (rejecting failure-to-
accommodate claim because employee's office relocation request was
unrelated to that employee's depression).

_____

[29] It is worth reproducing what Stratton identifies as the
"reprimand" at issue from her June 2018 performance review:

> Furthermore, since the late winter or early
> spring [Stratton] often worked in other
> locations around campus, without letting me
> know of where she was sitting.  Normally this
> is not a big issue if it occurs once in a
> while.  However, this has been very frequent
> in the last few months.  This prevents us from
> easily having informal discussions.  I simply
> request that she notifies me of her location
> when working in another location.  By knowing
> her location we could more easily have brief
> in-person conversations.  I am also open to
> making her work space better suited to her
> needs.

(Emphasis added.)  This comment from Gribbons and Albert reveals
that the problem was Stratton's lack of transparency as to where
she was working, not whether she could work in those alternative
locations.

In sum, the district court correctly entered summary judgment against Stratton with respect to her failure-to-accommodate claim.[30]

### III.

For the foregoing reasons, we affirm the district court's grant of Bentley's motion for summary judgment on all counts and the district court's denial of Stratton's motion to amend or alter the judgment.[31]

So ordered.

---

[30] We affirm the district court's grant of summary judgment as to Stratton's failure-to-accommodate claim under both the ADA and Chapter 151B.  See Sensing, 575 F.3d at 153.

[31] We review a district court's denial of a motion to amend or alter the judgment for abuse of discretion.  Perez v. Lorraine Enter., Inc., 769 F.3d 23, 28 (1st Cir. 2014).  Stratton contends that the district court's denial of her motion to amend the judgment was erroneous because the court's "grant of summary judgment was infected with numerous prejudicial errors of law and fact."  Given our affirmance of the district court's summary judgment decision, the district court did not abuse its discretion in denying Stratton's motion to amend or alter that judgment.